**Billy R. MONEY, Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare of the United States of America, Defendant.**

**No. B–C–77–91.**

United States District Court,
E. D. Arkansas, N. D.

May 11, 1979.

Sam H. Boyce, Newport, Ark., for plaintiff.

Fletcher Jackson, Asst. U. S. Atty., Little Rock, Ark., for defendant.

## OPINION

ARNOLD, District Judge.

This is a social security disability case. Cross motions for summary judgment are pending. The question is whether the decision of the Secretary finding the plaintiff disabled from February 15, 1976, to May 17, 1977, but not thereafter, is supported by substantial evidence.

The plaintiff, Billy Money, lives on five acres of land near Jackson, in White County (T. 32). He was born July 9, 1941, so he is now thirty-eight years of age (T. 33). He is six feet tall and weighs 230 pounds (T. 36). He has been married to Nellie Money for 13 years, and they have three children (T. 34).

The plaintiff quit high school after the tenth grade to join the Marines (T. 36). He was in the service from 1958 to 1963 and received his G.E.D., so he has the equivalent of a high school education (T. 38). After leaving the Marines with an honorable discharge, he became a policeman, first in St. Louis and then in Newport, Arkansas (T. 39). He then worked on a sporadic basis at a cannery in Indiana; the work was physically demanding but he gained no particular

skills there (T. 41). During this period of time, he attended tool and die school for nine months (T. 42).

Until February, 1975, when he suffered a job-related back injury, plaintiff was in good health and was leading a physically active life. He was a class A maintenance man at Nibco, a brass foundry in Augusta, Arkansas (T. 41). He had begun work at Nibco in 1970 and had worked his way up to that position. He had missed work only for short periods of time, due to minor illness (T. 44). The injury occurred when he bent over to pick up a heavy piece of metal; he felt "something tear" in his back (T. 43). He immediately went to the doctor and was hospitalized for a week (T. 44). He worked only seven months the rest of that year, much of which was light duty (T. 45). Being away from work bothered him a great deal:

> "The thing is, like I say, I was just a farm boy and I worked myself up to a Class A Maintenance and I wanted to hold onto the job because you get good pay for this area."

(T. 47). Then one day in February, 1976, suddenly his legs were unable to hold him, and he fell to his knees (T. 47). He immediately was hospitalized (T. 48). He tried to work after that but could not last a full day (T. 49).

Plaintiff's condition is exacerbated by severe pain; to ease it he must move around at regular intervals:

> "I have the back pain constantly. It's just that if I sit in one place for an hour, it gets worse. I can get up and walk around and it relieves it some."

(T. 49). He does the prescribed Williams back exercises twice a day when he can, but because of pain is seldom able to do them for three straight days (T. 53). Pain interferes with his sleep, too; after two to three hours he must get out of bed and walk around (T. 50). He takes Darvocet, a pain medicine, as needed, usually two to four a day; if it were not for the pain pills, plaintiff testified, he would get no sleep at all (T. 53). He is able to attend few social outings. He is unable to hunt; he occasion-

ally goes fishing, but his children do the actual fishing because he has to alternate sitting and standing (T. 55). He experiences discomfort sitting through a church service (T. 55). Plaintiff testified that during the day while at home he spends most of his time watching his wife work in the garden. He no longer makes any attempt to help around the house because "it just kills me" (T. 51).

The plaintiff's back condition is further exacerbated by his overweight condition. He testified that he has tried to lose weight, but without much success. "It's hard. It's one of the hardest things I ever done . . . It's an all-out battle." (T. 52).

The plaintiff's wife, Nellie Money, corroborated his testimony. She must help him get dressed (T. 66). He is unable to help with the housework. "He hurts constantly. He can't do anything." (T. 65). She believes that he would be working if he could (T. 66).

Jerry Miller, a vocational expert with nineteen years of experience working with disabled persons, heard plaintiff testify. It was Mr. Miller's opinion that plaintiff could not perform the work he had previously performed (T. 61), but that skills he had developed over the years could be transferred to other types of factory jobs such as inspection and assembly work, jobs which existed in the labor market in substantial numbers (T. 60). Other jobs for which the plaintiff would qualify, Miller testified, were that of guard or night watchman and night motel clerk (T. 60, 62). Miller noted, however, that plaintiff would have a limited capacity to respond to an emergency as a guard, and that he would have trouble as a night motel clerk handling customer complaints which required physical exertion, such as moving a broken television (T. 60–62). And Miller concluded that if the plaintiff's physical limitations were as severe as his testimony indicated, he would not be able to perform even these lighter jobs (T. 63).

During the course of treatment for his back injury, the plaintiff was seen by several physicians. Following the initial injury

in February, 1975, he was hospitalized in traction for a week and seen a few times thereafter by Dr. Leighton Millard, who recommended that he lose weight and do Williams low back exercises. On February 15, 1976, following the incident in which he fell to his knees, the plaintiff was hospitalized for bedrest and treatment of severe pain by Dr. John C. Dobbs, Jr., a family practitioner. Acute lumbosacral strain was diagnosed, and Dr. Dobbs discharged plaintiff on February 20, 1976, for further bedrest at home; Valium and Darvocet were prescribed for muscle relaxation and to relieve pain (T. 104–06). Dr. Jerry Thomas, an orthopedist, examined plaintiff and reported on March 26, 1976, that in his opinion the plaintiff had suffered no permanent disability or impairment (T. 109).

The plaintiff began regular treatment by Dr. William F. Blankenship, an orthopedic surgeon, on June 4, 1976. Dr. Blankenship observed a small fatty mass present to the right of the midline of plaintiff's area of tenderness in his lower back. He was experiencing no pain in his lower extremities. X-rays revealed a normal alignment of plaintiff's lumbar spine, with no fractures noted (T. 102–03). The integrity of the intervertebral disc spaces appeared to be maintained well at all levels; there was no evidence of spondylolysis or spondylolisthesis (T. 103). Plaintiff under went an electromyographic study which showed questionable irritation of the fifth lumbar vertebra bilaterally (T. 101). On July 30, 1976, Dr. Blankenship reported that plaintiff was treated with an injection of Depo-Medrol and Lidocaine in the two fatty masses in the lumbar region, and was then able to touch the floor with both hands (T. 100). On August 20, 1976, plaintiff reported to Dr. Blankenship that he had experienced the first relief in over a year; Dr. Blankenship advised that he could return to his job in janitorial care at that time (T. 99). On August 27, 1976, the plaintiff reported that he had returned to work for two days but began having back pain on the third. Dr. Blankenship re-injected the fatty masses and advised plaintiff to return to work if he felt able to do so (T. 98).

Dr. Blankenship continued treating plaintiff and referred him to Dr. Jim Moore because of his complaints of back pain and headaches. Dr. Moore agreed with Dr. Blankenship that the fatty nodules should be removed (T. 112). On November 12, 1976, Dr. Blankenship reported that surgery would be postponed to allow Dr. Dobbs to treat an acute bronchotic episode plaintiff was suffering. The plaintiff was advised to remain off work (T. 112). Dr. Blankenship gave plaintiff another injection on December 3, 1976, and reported that it provided some relief (T. 111). On December 10, Dr. Dobbs reported that the plaintiff was continuing to have severe back pain and that his condition was exacerbated by being overweight (T. 108). On January 19, 1977, Dr. Blankenship again saw plaintiff and reported his impression that he was suffering lumbosacral strain due to herniation of fat pads through the lumbodorsal fascia (T. 118). Dr. Blankenship performed a laminectomy in February, 1977, and after six weeks released plaintiff to work (T. 129); he attempted light work, but worked only six hours one day and four and one-half the next before the pain became so severe that he could not continue (T. 125). Plaintiff expressed to Dr. Dobbs his feeling that the surgery was not very helpful (T. 125).

On April 26, 1977, plaintiff was examined by Dr. Joe K. Lester, an orthopedic surgeon, who reported his estimate that the plaintiff had a twenty-five per cent impairment to the body as a whole; in coming to this conclusion, Dr. Lester noted that plaintiff had undergone an extensive laminectomy at L5, disc surgery at L4, and had additional stiffness. Dr. Lester expressed concern that plaintiff might have associated arthritis and suggested an arthritis work-up. Although indicating his opinion that the plaintiff's "temporary period of disability is ended," Dr. Lester indicated "serious doubt that he can return to gainful employment of a strenuous nature or employment which would require prolonged standing, squatting, stooping, or kneeling." (T. 130).

Dr. Douglas A. Stevens made a psychological and vocational evaluation of plain-

tiff on May 31, 1977. He reported that plaintiff complained of constant pain in his lower back with ten per cent of the pain rated as mild to moderate but ninety per cent rated as severe. Dr. Stevens noted that plaintiff had good intelligence and potential for a wide range of rehabilitative re-training should his physical condition improve. The plaintiff was thought to be preoccupied with his physical condition, suffering from a rather severe situational-depressive reaction with moderate anxiety, and he was therefore likely to become tense, develop additional pain due to the tension, and then feel more stress because of the pain. Dr. Stevens concluded:

> In summary we are dealing with a young man who has much intellectual and vocational potential, as well as potential for re-training if his physical condition could be improved. *However, he manifests the typical chronic pain syndrome which, if not treated effectively, typically lasts on a permanent basis.* At the present time this man is certainly totally disabled from substantial gainful activity, since he is unable to sustain activity for prolonged periods of time and must instead keep changing positions in order to handle his pain. He is preoccupied with his physical discomfort and unable to sustain that attention to a task. Considering the future, I cannot predict the outcome of his condition other than to state that the majority of chronic pain patients keep the level of pain that they initially manifest and often deteriorate over time. *If this were true in Mr. Money's case, his present total disability would remain permanent.* If in some way he could be admitted to a chronic pain treatment program and learn to control his discomfort in such a way that re-training or a return to employment could be considered, this level of disability would drop from total to a figure reflecting his capacity at that time to engage in light or sedentary work.

The Administrative Law Judge found that the plaintiff was disabled within the meaning of the Social Security Act from February 15, 1976, until May 17, 1977, but not thereafter. He reasoned that the plaintiff had "no remarkable degree of continued physical impairment" and could perform light work on jobs which existed in substantial numbers in the area. He further found that the "preponderance of credible evidence" did not reveal that his complaints of pain were such as to preclude plaintiff's return to substantial gainful employment. He concluded that plaintiff was not disabled after May 17, 1977, the date of Dr. Lester's medical report. This decision was affirmed by the Appeals Council, and this suit followed. The plaintiff alleges that the decision that disability ended May 17, 1977, is not supported by substantial evidence.

■ This Court is not free to substitute its judgment for that of the administrative finders of fact. If the findings are supported by substantial evidence, the Court is required to accept them. Substantial evidence is more than just *some* evidence, however; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Further, the Court must base its decision upon all the evidence in the record and not just the evidence favorable to the Secretary. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The plaintiff has the burden of showing an inability to perform his past occupation due to a medically determinable physical or mental impairment. Once he has done so, the burden shifts to the Secretary to show that he can perform some other type of substantial, gainful work. *Johnson v. Califano*, 572 F.2d 186, 187–88 (8th Cir. 1978). Pain may be found to be disabling if it is not remediable and is severe enough to preclude substantial gainful activity. *Calpin v. Finch*, 316 F.Supp. 17 (W.D.Pa.1970).

■ The Court has carefully reviewed the record as a whole and has concluded that the decision of the Secretary is not supported by substantial evidence and must be reversed. The plaintiff established that

because of his back injury and pain associated with it he was no longer able to perform his past occupation. The burden then shifted to the Secretary to show that he could perform some other type of gainful activity. That burden was not met in this case. The Administrative Law Judge concluded that:

> The preponderance of the credible evidence does not reveal that the claimant's physiological and symptomological complaints, particularly pain associated with physical activity, is such as to preclude his returning to substantial gainful employment; . . . .

Almost all of the evidence, however, is to the contrary. The plaintiff testified that he could engage in very little physical activity without a great deal of pain. He was unable to help around the house, dress himself, or sit through a church service without considerable discomfort. He could sleep no more than two or three hours without having to get up and move around. His testimony was corroborated by his wife and by several medical reports. Dr. Douglas Stevens, a psychologist, stated in a report following his evaluation of plaintiff on May 31, 1977, that he was suffering from a "chronic pain syndrome" which usually lasted on a permanent basis if not effectively treated; he further gave the opinion that plaintiff was totally disabled from substantial gainful activity. It is true that Mr. Miller, the vocational expert, testified that lighter jobs for which plaintiff was qualified existed in the area in substantial numbers; he qualified his testimony, however, by stating that if the plaintiff's physical limitations were indeed as severe as plaintiff testified that they were, he would not be able to perform even these jobs.

Much of the testimony at the hearing related to the pain which plaintiff was suffering. Much of this evidence was subjective in nature and difficult to evaluate. The Court of Appeals has warned recently that the administrative factfinder must give serious consideration to such evidence even though it may not be corroborated fully by objective examinations and tests. *Northcutt v. Califano,* 581 F.2d 164 (8th Cir. 1978). Serious consideration of such evidence was especially warranted in this case in view of the clinical findings of Dr. Stevens and his opinion that the plaintiff's pain was disabling.

The Administrative Law Judge found the plaintiff disabled for a period of fifteen months, and the evidence supports the conclusion that he indeed was disabled during those months. The plaintiff had attempted to work on several occasions but without success, and had undergone back surgery. The only indication that disability ended on May 17, 1977, is the opinion of Dr. Joe Lester in a letter of that date following his examination of plaintiff on April 26. Dr. Lester stated that at that point plaintiff's "period of temporary disability is ended." Dr. Lester gave no other indication, however, that plaintiff's condition had improved in the few months preceding his examination. He concluded his report by assessing a permanent impairment of twenty-five per cent to the body as a whole, suggesting an arthritis work-up because of unexplained stiffness, and indicating "serious doubt that he can return to gainful employment of a strenuous nature or employment which would require prolonged standing, squatting, stooping, or kneeling." There is no indication that Dr. Lester examined the plaintiff other than this one time.

■ The Administrative Law Judge's opinion makes it clear that he relied upon Dr. Lester's report in finding no disability after May 17, 1977:

> . . . [T]he claimant was disabled within the meaning of the Social Security Act for the period from February 15, 1976 to May 17, 1977, the date of the earliest medical report indicating that . . . light and sedentary work is not contraindicated . . . . .

(T. 15). Neither the Administrative Law Judge nor this Court, however, is free to single out as the basis for the decision only the evidence favorable to the Secretary, and the Court is convinced that this is what the finder of fact did in this case. When the record is considered as a whole—including

medical reports, the testimony of the plaintiff, his wife, and Mr. Miller—there is no substantial evidence that the plaintiff's disability ended May 17, 1977.

That portion of the Secretary's decision finding that disability ended on May 17, 1977, must therefore be reversed.